NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                     :
ALAN N. SCOTT,                       :
                                     :
               Petitioner,           :
                                     :        Civil Action No. 09-4710 (RMB)
          v.                         :
                                     :
FCI FAIRTON,                         :
                                     :        M E M O R A N D U M   O P I N I O N
               Respondent.           :
_____:

     This matter, having obtained a rather substantial procedural history, ultimately comes before the Court upon Petitioner's submission of the latest version of his petition, filed pursuant to 28 U.S.C. § 2241, and upon Respondent's opposition to the same, and it appearing that:

1.     On March 3, 2009, Petitioner filed his original § 2241 petition; that submission gave rise to Civil Action No. 09-0929 (D.N.J.). That initial submission was illegible (in the sense that it allowed the Court to merely discern only that Petitioner's challenges were related, in one way or another, to the Residential Drug Abuse Treatment Program ("RDAP") administered at Petitioner's then-place-of-confinement, F.C.I. Fairton, but the Court could not determine with any degree of clarity any other aspects of Petitioner's claims) and, in addition, unexhausted administratively. The Court, therefore, dismissed the original petition without prejudice, preserving Petitioner's challenges, explaining to Petitioner the exhaustion requirement and directing the Clerk to remit Petitioner's filing fee.

2.     In response, Petitioner submitted a motion for reconsideration and accompanied that submission with his amended petition. Examining the statements made in the amended

petition and the public records of Petitioner's criminal proceedings that the Court could detect, this Court issued, on May 22, 2009, an order and accompanying opinion ("May Opinion") which re-explained to Petitioner the exhaustion requirement and, upon addressing the exhaustion issue and the merits of the amended petition, dismissed the amended petition as drafted, but allowed Petitioner to re-amend his amended petition with regard to a certain narrow issue (clarifying that such amendment shall be undertaken if – by that time – Petitioner duly completes administrative exhaustion of that issue).

3.    In response, Petitioner filed his re-amended petition asserting: (a) civil rights challenges against the officials employed at the F.C.I. Fairton; and (b) asserting additional challenges against the officials employed at the F.C.I. Terre Haute (which is Petitioner's current place of confinement, where Petitioner was transferred from the F.C.I. Fairton).  The Court addressed the merits of the re-amended petition and dismissed that pleading too; the dismissal of Petitioner's civil rights claims was without prejudice to raising these claims in a civil complaint filed in this District (as to the Fairton officials), and Petitioner's numerous factually-unrelated-to-Fairton challenges (raised against Terre Haute officials) were dismissed without prejudice to raising those challenges by means of a civil complaint (or even a habeas application, different from the original and amended petitions filed in this matter, in light of the requirements of Habeas Rule 2(e)) before the court of appropriate venue.

4.    In response to the Court's decision to that effect, Petitioner submitted another motion for reconsideration which, in effect, was Petitioner's re-re-amended petition that asserted: (a) another RDAP-based line of habeas challenge (different from the challenges stated in his

prior, that is, re-amended petition, in the sense that the new line of challenge asserted a factual scenario qualitatively different from the scenario asserted in or hinted at Petitioner's prior pleadings)[1]; and (b) another set of civil rights challenges.  Being presented with this new mix of habeas and civil rights allegations, this Court again dismissed, without prejudice, Petitioner's new civil rights challenges (which, this time around, were based on Petitioner's transfer from Fairton to Terre Haute) and, turning to Petitioner's new line of habeas challenges, directed the Clerk to open a new and separate habeas matter (in order to entertain these challenges) and ordered Respondent to answer these new challenges: these set of directives and the Clerk's compliance with the same resulted in initiation of the instant matter, that is, Civil Action No. 09-4710 (D.N.J.).[2]

5.      In response to the Court's decision directing the Clerk to initiate the instant matter for Petitioner and directing Respondent to answer Petitioner's factually new challenges, Petitioner filed: (a) another motion for reconsideration disputing the Court's determination that Petitioner's challenges based on a transfer from one prison to another qualified as a civil rights rather than a habeas claim; and (b) an appeal with the United States Court of Appeals for the Third Circuit challenging the Court's determinations (that addressed the initial

---

[1]  The distinction between Petitioner's initially asserted and later changed factual scenarios is detailed infra.  See this Opinion, ¶ 13.

[2]  Although no statement made in Petitioner's motion for reconsideration (which, effectively, was a re-re-amended petition) indicated that the new set of facts asserted by Petitioner was unknown to Petitioner at the time of his filing of his amended or re-amended petitions (and, therefore, Petitioner's submission did not present a valid basis for reconsideration), the Court – being mindful of Petitioner's pro se litigant status – presumed that Petitioner's failure to assert his facts clearly in his first two rounds of pleadings could have been a result of Petitioner's confusion and found it in the interests of justice to initiate the instant matter in order to provide Petitioner with a full and fair opportunity to litigate his new claims.

versions of Petitioner's habeas claims and his failure to exhaust, and dismissed his civil rights claims without prejudice).  Petitioner's appellate application was dismissed by the Court of Appeals as interlocutory and sought without asserting proper appellate jurisdiction. See Scott v. Fairton FCI, 2010 U.S. App. LEXIS 9661 (3d Cir. N.J. May 11, 2010).   In addition, while this Court was awaiting Respondent' answer, Petitioner also filed, in the instant matter, numerous letters and applications, including, inter alia, a motion seeking leave to  amend his latest round of pleadings by effectively restating the very facts already asserted in his motion for reconsideration (which the Court already construed as a habeas petition and directed initiation of the instant matter on the basis of a so-qualified petition), a motion seeking "summary judgment" as to his habeas challenges (even though such application was facially inapplicable to the proceedings at hand), a motion seeking "leave to engage in discovery" (even though Respondent was already directed to serve upon Petitioner the entire pertinent record), a letter putting the Court on notice of  Petitioner's displeasure with regard to the Court's decision to open the instant matter, etc.  See Instant Matter, Dockets Entries Nos. 9, 11, 12 and 19.  Moreover, while Petitioner's interlocutory appeal was pending, Petitioner continued filing various submissions in the instant matter, informing the Court of every new incident of his prison life and stating every disagreement Petitioner had with regard to every such incident, regardless of whether or not these incidents – or Petitioner's displeasure with them – had any nexus with the claims that gave rise to the instant matter.  See, e.g., Instant Matter, Docket Entries Nos. 23 and 24 (informing the Court about Petitioner's prospects as to being transferred to a "half-way" house, expressing Petitioner's opinion about Respondent's alleged misapplication of the Second

Chance Act, stating Petitioner's reflections on the decision reached with regard to his probation supervision in the District of Massachusetts, etc.).  Respondent, meanwhile, filed his answer to the Petition and moved for partial sealment of Petitioner's underlying record.

6.    Taking notice of Respondent's application for sealment and in response to Petitioner's flood of filings, this Court issued a decision dismissing Petitioner's application to again amend his pleadings as moot, denying Petitioner's application for summary judgment as superfluous in habeas proceedings, granting Respondent's request for partial  sealment, etc., i.e., disposing of all then-pending applications short of the claims that  gave rise to the instant matter and served as bases for Respondent's answer.  See Instant Matter, Docket Entry No. 26.  The Court's decision disposing of all peripheral aspects and narrowing the issues to Petitioner's habeas challenges was issued on June 16, 2010.  See id.

7.    On June 18, 2010, Respondent filed a letter advising the Court about a recent decision issued by the Court of Appeals for the Ninth Circuit.  See id. Instant Matter, Docket Entry No. 27. Within ten days from  that filing, Petitioner filed: (a) a motion seeking an "expedited" resolution of the his habeas claims, see Instant Matter, Docket Entry No. 28; and (b) a letter expressing his opinion that Respondent's reliance on the recent decision by the Ninth Circuit was erroneous.  See Instant Matter, Docket Entry No. 29.  As detailed infra, Petitioner's latest round of submissions changed, once again, Petitioner's factual assertions by effectively: (a) reverting them, factually, to the assertions already examined and dismissed by the Court in the Court's decisions addressing Petitioner's re-amended and re-re-amended petitions, and, in addition, (b) changing the legal bases of Petitioner's challenges , i.e., by raising claims not raised in his motion for reconsideration which – upon being re-

characterized into a habeas petition – gave rise to this matter and served as a basis for Respondent's answer.  See id.; accord this Opinion, ¶ 19.

8.    While filing the aforesaid applications and changing, once again, the facts and legal grounds of his habeas claims with regard to the instant matter, and having accrued twenty-nine docket entries in his original action, that is, Civil Action No. 09-0929, and the same number of docket entries in the instant matter (including more than half a dozen decisions by this Court addressing both actions, with the latest being entered on June 16, 2010), Petitioner seemingly concluded on August 3, 2010, that the Court would cease exercising its jurisdiction over the instant matter and filed an application with the Court of Appeals seeking a writ of mandamus directing this Court to exercise its jurisdiction over Petitioner's habeas challenges litigated in this action,[3] see In re Scott, USCA No. 10-3514; that application is currently pending.

9.    Although the Court is not entirely clear as to the basis for Petitioner's impression that this Court intends to cease exercising its jurisdiction over the instant matter, the Court finds it

---

[3]   As the Court of Appeals explained, "[m]andamus is a drastic remedy available only in extraordinary cases.  See In re Diet Drugs Prods. Liab. Litig., 418 F.3d 372, 378 (3d Cir. 2005). To obtain a writ of mandamus, a petitioner must demonstrate that  (1) there are no other adequate means of obtaining the underlying relief he seeks, (2) his right to the writ is 'clear and indisputable,' and (3) 'the writ is appropriate under the circumstances.'  Hollingsworth v. Perry, 130 S. Ct. 705, 710 (2010)  (per curiam) (quotation marks and citation omitted).  [A habeas petitioner] does not need a writ of mandamus to obtain a ruling on his habeas petition. Although a writ of mandamus may be appropriate when a district court's 'undue delay is tantamount to a failure to exercise jurisdiction,' see Madden v. Myers, 102 F.3d 74, 79 (3d Cir. 1996), that situation is not present [in a normal course of adjudication].  Accordingly, we will deny [petitioner's] mandamus petition [since w]e trust that . . . the District Court will rule on his habeas petition in short order. "   In re Bond, 2010 U.S. App. LEXIS 13323, at *2-3 (3d Cir. June 29, 2010) (addressing a five-month lull in adjudication of the claims raised by a federal prisoner who remained in correctional facility during the last five months of his prison term without being transferred to a half-way house).

appropriate – in light of Petitioner's concerns – to grant Petitioner's latest motion seeking an expedited ruling.  As detailed below, Petitioner's habeas challenges will be dismissed.

10.    In order to address the panoply of Petitioner's habeas challenges, the Court finds it appropriate to begin with a detailed summary of Petitioner's claims that have been resolved thus far.  A good starting point appears to be the Court's May Opinion entered with regard to Petitioner's first round of amended habeas challenges (stated in his first "Amended Petition").  Specifically, in its May Opinion, the Court observed that

> [t]he Amended Petition . . . asserts that:
>
> [(a)]    Petitioner had two indictments prosecuted against him at the United Stated District Court for the Eastern District of New York ("EDNY"), and these indictments were returned in 2006 and 2007.
>
> [(b)]    Petitioner had three indictments prosecuted against him at the United Stated District Court for the District of Massachusetts ("DMASS"), and these indictments were returned in 1997, 1998 and 1999, see id. (providing the indices of these criminal matters);
>
> [(c)]    Petitioner's guilty pleas in the EDNY resulted in two consecutive sentences, one of 32 months and another of 33 months, both imposed on April 29, 2008, [but] . . . Petitioner's EDNY appeal was filed only in one EDNY action, and it was dismissed.
>
> [(d)]    the DMASS prosecutions also resulted in two consecutive sentences, one of 96 months (imposed on February 8, 2000) and another of 48 months, imposed on an unspecified date in April 2000, with the latter being reversed by the [First Circuit].
>
> Clarifying that his [first round of amended] habeas challenges relate[d] solely to his EDNY sentences, Petitioner assert[ed that the] FCI Fairton warden ha[d] improperly denied [him] placement in RDAP program despite [alleged by Petitioner] substantial documentary evidence of substance abuse in the 1 yr. period relevant to [P]etitioner's federal criminal conduct in the community [i.e., the period when Petitioner was committing his crimes].
> . . .
> While [the Court noted that] the entirety of Petitioner's criminal history f[ell], at least at [that] juncture, outside this Court's full comprehension, a

certain amount of pertinent information [was] obtained [by the Court] from . . . the thoughtful and detailed decision of the United States Court of Appeals for the First Circuit cited by Petitioner in his Amended Petition.  In [that decision,] the First Circuit stated:

> Identity theft is said to be among this country's fastest growing crimes.  In the 1990's and earlier, Alan Scott [i.e., the Petitioner], a former paralegal handy with documents, apparently enhanced his income through an extensive array of white collar crimes using the identities of others.  Those of his activities that took place in the late 1990's led to a series of indictments and three separate criminal cases against him [in DMASS], one case a year from 1997 to 1999; all three cases led to convictions. . . . We take the cases in chronological order.  In a 1997 case, Scott pled guilty to bank fraud . . . and to making and possessing a forged check . . . .  Scott took checks from a Boston law firm that had employed him as a legal assistant [and] deposited the checks, with forged endorsements, in bank accounts in Texas.[4]  For these crimes he received a combined sentence of 96 months . . . .  In a 1998 case, a jury convicted Scott of conspiring to make and of making false claims to an agency of the United States [after] Scott filed twenty false income tax returns with the IRS . . . seeking tax refunds in the names of at least twelve people . . . , and the intended loss to the government exceeded $ 80,000.00. For these crimes he received sentences of 96 months for the conspiracy and 60 months for the false returns, concurrent with each other and with the sentence imposed in the 1997 case . . . .  In a 1999 case, Scott also pled guilty to an additional and different bank fraud, . . . and to conspiring to commit that fraud . . . .  The scheme involved fraudulently obtaining bank automobile loans. For this crime he was sentenced to a 46 month sentence, consecutive to those for the earlier cases . . . .

Moreover, it appears that, until his sentencing in April of 2000, Petitioner was not held in physical custody of the BOP or any other correctional institution or a similarly restraining facility: rather, he was in home confinement.  . . .   Consequently, it appears that Petitioner's practice of abusing controlled substances, which – according to his Petition – took place from 1993 to 1999, went into remission during the period of his pre-trial home confinement on DMASS charges . . . .   Indeed, with respect to his

---

[4]  "Knowing that Scott had a criminal record, a partner of the firm wanted to give him an opportunity to get his life straight.  This brings to mind the adage that no good deed goes unpunished."  Scott-First Circuit, 270 F.3d at 34 ad n.1.

EDNY sentences, the execution of which is the sole issue challenged in this action, Petitioner made applications to his sentencing EDNY judge requesting (and then numerously re-requesting) a directive that Petitioner would be enrolled in RDAP.  Petitioner's sentencing judge, however, denied these applications stating as follows: "Request denied.  The Court denies to order that the BOP is required to allow [Petitioner] to participate in the RDAP program.  Instead, as referred in the Judgment and as discussed at sentencing, it was a non-binding recommendation by the Court."

. . .

[Thus, for the reasons detailed below, e]ven if this Court were to hypothesize that [Petitioner duly exhausted his instant habeas claims administratively, his] allegations -- as stated in the Amended Petition -- do not amount to a cognizable claim.

In 1990, Congress charged the BOP with making available "appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse."  To carry out that requirement, as part of the 1994 Violent Crime Control and Law Enforcement Act, Congress amended § 3621 to require the BOP, subject to the availability of appropriations, to provide residential substance abuse treatment for all "eligible" prisoners.  An "eligible" prisoner is one who is "determined by the Bureau of Prisons to have a substance abuse problem," and who is "willing to participate in a residential substance abuse treatment program."  As an incentive for successful completion of the residential treatment program, the period of time a prisoner convicted of a nonviolent offense remains in custody after successfully completing such a treatment program may be reduced up to one year by the BOP.  It appears that the Section 3621(e)(2) reduction of sentence is the issue Petitioner is interested in.

The BOP has promulgated regulations at 28 C.F.R. § 550.56 to implement the statutory requirement.  The regulation requires that "[t]he inmate must have a verifiable documented drug abuse problem."  "The decision on placement is made by the drug abuse treatment coordinator."  The BOP application of this regulation is contained in Program Statement 5330.10, which provides, in pertinent part:

> 5.4.1. Drug abuse program staff shall determine if the inmate has a substance abuse disorder by first conducting the Residential Drug Abuse Eligibility Interview followed by a review of all pertinent documents in the inmate's central file to corroborate self-reported information.  The inmate must meet the diagnostic criteria for substance abuse or dependence indicated in the Diagnostic and Statistical  Manual of Mental Disorders, Fourth Edition.  This

diagnostic impression must be reviewed and signed by a drug abuse treatment program coordinator.   Additionally, there must be verification in the Pre-sentence Investigation Report or other similar documents in the central file which supports the diagnosis. Any written documentation in the inmate's central file which indicates that the inmate used the same substance, for which a diagnosis of abuse or dependence was made via the interview, shall be accepted as verification of a drug abuse problem.

The Diagnostic and Statistical manual of Mental Disorders, Fourth Edition ("DSM-IV"), published by the American Psychiatric Association, defines Substance Abuse or Substance Dependence as a cluster of certain listed symptoms in the same twelve-month period.  The first twelve-month period following Dependence or Abuse is designated Early Remission.  However, the specifiers of Early Remission do not apply if the individual is in a "controlled environment." Examples of a "controlled environment" include "closely supervised and substance-free jails, therapeutic communities, or locked hospital units."  Consequently, the BOP has instituted a practice of: (1) reviewing the prisoner's history of substance abuse during the twelve-month period precedent entry into a "controlled environment"; and (2) examining the prisoner's central file to determine if documentation exists to support a claim of substance abuse or dependence during the twelve-month period immediately preceding the prisoner's incarceration.  If an inmate's documents reveal that, during the twelve-month period immediately preceding the inmate's incarceration (or placement in a  substance-free jail, therapeutic community or locked hospital unit), the inmate went into remission in the sense that there was no record of substance abuse, the BOP denies the Section 3621(e)(2) reduction of sentence (although the inmate is typically allowed to participate in the locally-administered DRAP program). For instance, if -- during the period of pre-trial release, that is, prior to the entry into qualifying "controlled environment" -- the inmate does not abuse controlled substances for the period of twelve months or longer because the inmate is released on bond and under supervision, during which he is subjected to random drug testing, the BOP does not deem such "constructive custody" a qualifying  "controlled environment" and, thus, does not allow Section 3621(e)(2) reduction of sentence.

In light of the standards set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the courts reviewing inmates' challenges to the BOP decisions denying Section 3621(e)(2) reduction of sentence to inmates who went into remission during "constructive custody" upheld the BOP's decisions reasoning as follows:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Even where the agency construction appears in an "interpretive" rule not subject to the "notice-and-comment" procedure of the Administrative Procedure Act, the agency's interpretive rule is entitled to "some deference" where it is a permissible construction of the governing statute. In Lopez v. Davis, 531 U.S. 230 (2001), the Supreme Court upheld a related BOP regulation interpreting the phrase "nonviolent offense" and categorically excluding certain types of prisoners from participation in the early-release program.

Beyond instructing that the Bureau has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so. In this familiar situation, where Congress has enacted a law that does not answer "the precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the statutory gap "in a way that is reasonable in light of the legislature's revealed design."

Similarly, here, Congress has not spoken to the precise question at issue but has left it to the discretion of the [BOP] to determine which prisoners "have a substance abuse problem." The BOP reasonably has turned to the DSM-IV criteria to identify prisoners who have a substance abuse problem. As the DSM-IV, in turn, dictates that diagnosis is dependent upon the existence of certain symptoms during a twelve-month period, and that remission is dependent upon the absence of those symptoms unless one is in a "controlled environment," it is reasonable for the BOP to evaluate the existence of those symptoms during the twelve-month period immediately preceding a prisoner's entrance into the controlled environment of long-term incarceration. . . . Thus, the challenged . . . practice of the BOP is a reasonable interpretation of the statute, as most courts agree.

> In light of the DSM-IV definition of remission as excluding only those periods during which the individual is in a "controlled environment" such as "closely supervised and substance-free jails … or locked hospital units," it is not arbitrary and capricious for the BOP to include remission behavior during periods of only limited supervision such as Petitioner's release on bail subject only to random drug testing.

> Here, Petitioner appears to assert that he should qualify for Section 3621(e)(2) reduction of sentence because he was abusing controlled substances during the time when he committed some of his multiple criminal offenses.

> Petitioner misreads both the language and the goal of Section 3621(e)(2): the provision was enacted not to offer a reward, in the form of reduced prison sentence, to those offenders who committed their criminal acts while abusing controlled substances but to offer a life-straightening opportunity to those persons who, upon their entry into a "controlled environment" suffer of the ill of drug abuse.   In other words, the sole purpose of Section 3621(e)(2) is rehabilitation of those individuals who suffer of drug abuse at the time -- or shortly prior to the time -- when they enter a "controlled environment": this purpose is not related to the problem of substance abuse that the offenders might have had sometimes in the past but managed to conquer a year (or longer) prior to their entry in a "controlled environment."

> Consequently, since it appears that Petitioner [was in] home confinement . . . without suffering from the drug abuse problem, [and] he does not assert that the BOP was presented with documented evidence of Petitioner's drug abuse during the twelve months preceding Petitioner's entry of the BOP custody, Petitioner's allegations do not state a cognizable claim.  Plainly put, in order to state a cognizable claim, Petitioner must assert that he suffered of a verifiable drug abuse problem during the twelve consecutive non-controlled-environment months preceding his . . . incarceration.   The Amended Petition, however, failed to so assert.  Therefore his Petition must be dismissed for failure to state a claim.

May Opinion, at 4-15 (citations omitted, selected footnotes incorporated in the main text).

11.   In other words, the Court's May Opinion conclusively determined that, in the event Petitioner was held outside the BOP custody (or outside any other custody comparable to a prison environment), e.g., if he was held in home confinement, during the twelve months preceding his incarceration, the BOP's decision to deny Petitioner RDAP enrollment and

Page 12 of  40

consideration for RDAP-based incentive could be frivolous and abuse of discretion only if Petitioner properly presented the BOP with verifiable documentary evidence showing that, during *these* twelve months of home confinement, Petitioner was actually abusing controlled substance(s) within the meaning of applicable regulatory regime.  See id.  Since Petitioner's Amended Petition did not assert any facts to that effect, the Court dismissed Petitioner's habeas challenges stated in the Amended Petition.  However, recognizing that Petitioner was a pro se litigant, and that the Court's conclusions were reached, in part, upon taking judicial notice of the statements made in the judicial decisions entered  by the courts presiding over Petitioner's criminal prosecutions and/or the courts presiding over Petitioner's appeals as to his criminal convictions, the Court found it prudent to avail Petitioner to an opportunity to re-clarify, one more time, his habeas claims: thus, Petitioner would have a chance to state whether he actually presented the BOP with verifiable documentary evidence that, during the twelve months preceding his entry into the BOP's custody (or comparable custody), Petitioner was abusing controlled substance(s) within the meaning of the applicable legal regime.  See id. at 18.  Therefore, the Court's May Opinion and accompanying order granted Petitioner leave to re-amend his pleadings with regard to that narrow issue.

12.   As already noted supra, in response to the Court's decision to that effect, Petitioner submitted a voluminous re-amended petition and incorporated into that submission his first motion for reconsideration.  Although the narrow issue with regard to which Petitioner was granted leave to amend was barely addressed in that submission (since the submission was largely dedicated to civil rights challenges against Fairton officials and claims against Terre Haute officials), this Court sifted out the relevant habeas information from the mix of

Petitioner's assertions and, coming to the conclusion same as the one reached in its May

Opinion, re-explained, once again, the rationale of the Court's decision to Petitioner,

detailing as follows:

> The position taken by the Regional Office / Central Office appears to be
> clear: since Petitioner was in home confinement during the almost-thirteen
> months preceding his incarceration and – during that period – he was not
> abusing, or even using, any controlled substances, Petitioner does not qualify
> for RDAP-based incentive reduction of sentence.  This position is consistent
> with the conclusion reached by the Court in its [May] Opinion: because
> Petitioner's home confinement was not a "controlled environment," such as
> a closely-supervised-and-substance-free jail or a locked hospital unit, it was
> not unreasonable for the BOP to conclude that Petitioner's drug addiction
> went into voluntary remission during Petitioner's thirteen months of home
> confinement [because Petitioner did not present the BOP with evidence of
> drug abuse during that period], hence allowing the BOP to deny Petitioner's
> RDAP-based incentive reduction of his chain of sentences.  As expressed in
> his Second Amended Petition, Petitioner's position could be reduced to an
> assertion that Petitioner's home confinement was "controlled enough" to
> qualify as a "controlled environment" for the purposes of RDAP, because
> Petitioner had no roommates, was rarely outside his home, was -- officially
> -- meeting very few persons, plus had unannounced inspections of his
> residence and frequent drug testing.  The obvious import of Petitioner's
> contention is that: (a) Petitioner wanted to use illegally controlled substances
> but did not so simply because the environment he was in prevented him from
> any meaningful opportunities ; (b) as such, his withdrawal from drug abuse
> during the home confinement was wholly involuntary; (c) which, in turn,
> means that no genuine remission of Petitioner's drug addiction took place
> during the thirteen months of his home confinement; and (d) therefore, the
> period for the purposes of RDAP should be the twelve-month period
> preceding Petitioner's home confinement, i.e., the period with regard to
> which Petitioner has certain evidentiary record suggesting drug usage.  This
> Court disagrees.  The environment of closely-supervised jail (or a locked
> hospital unit) qualitatively differs from that of home confinement. In a jail,
> the inmates and visitors are channeled, upon entry, through metal detectors
> and subjected to pat-searches and, often -- if not always -- through strip
> searches.  All items delivered to jails, be they food, prison clothing, toiletries,
> cleaning supplies, fixture, mail, packages from visitors, etc. are thoroughly
> searched. All public facilities are thoroughly searched, and the facilities
> themselves, as well as the cells of inmates, are made of materials -- and
> contain limited furnishing -- rendering the process of concealment of
> contraband relatively complex.  Moreover, the facilities, inmates and visitors

are occasionally subjected to searches with canines trained to locate controlled substances, and inmates (cooperating with prison officials by agreeing to become informants) enable monitoring of those prison activities that take place during odd hours and/or in odd parts of prison facility.  The home confinement described by Petitioner does not rise to this level.  In sum, while Petitioner might have felt inconvenienced by the circumstances of his home confinement, that environment cannot be equated with the environments of a closely-supervised jail or a locked hospital unit.  Here, the question for the Court is whether the BOP's determination was not unreasonable.  Provided the BOP has acted rationally, the Court may not substitute its judgment for the agency's interpretation.  In light of the foregoing discussion, the Court finds that it was not unreasonable the Regional Office / Central Office of the BOP drew the a distinction between the controlled environment of closely-supervised jails/prisons/locked hospital units and the home confinement experienced by Petitioner. Therefore, it was not unreasonable for the BOP to conclude that Petitioner voluntarily withdrew from abuse of controlled substances during the thirteen months preceding his incarceration and, hence, was not qualified for RDAP-based reduction of his chain of sentences.

Civil Action No. 09-0929, Docket Entry No. 9, at 8-10 (citations and footnotes omitted).

13.     It is in response to that particular determination that Petitioner submitted another "motion for reconsideration" which was qualified by the Court as a petition asserting a qualitatively different factual scenario and warranting initiation of the instant matter.  See Civil Action No. 09-0292, Docket Entry No. 12.  Specifically, that "motion for reconsideration" asserted that Petitioner had indeed presented the BOP with proper documentary proof that, during the twelve-month period preceding his incarceration, Petitioner was abusing controlled substance(s) within the meaning of the applicable regulatory regime, but the BOP ignored the fact of Petitioner's presentment of proper evidence.  See id.  Since these allegations were qualitatively different from Petitioner's previously asserted facts (i.e., from his previous – and dismissed – set of allegations maintaining that: (a) Petitioner did not abuse controlled substances during his home confinement preceding his incarceration, but (b) such

confinement was akin to incarceration and, therefore, the focus of the Court's inquiry should be limited to the 12-month period preceding his home confinement), this Court directed initiation of the instant matter and ordered Respondent to address Petitioner's mutated factual challenges (i.e., his claims that Petitioner presented the BOP with proper evidence that he abused controlled substances during the twelve months preceding his incarceration, and such abuse was within the meaning of the relevant regulatory regime).  See Civil Action 09-0929, Docket Entry No. 15.

14.   Respondent duly answered *that* set of Petitioner's contentions and asserted that the BOP's decision denying Petitioner the RDAP-based sentence-reducing incentive was proper. Although the Court disagrees with certain peripheral observations made in Respondent's brief (which, the Court notes in passing, are in no way dispositive to the outcome of this matter),[5] the Court finds that Respondent's core conclusions are correct.

_____

[5]  The Court's point of disagreement with Respondent's position ensues from Respondent's inclusion in its brief his second point, titled: "Scott has no liberty interest in the mere *possibility* of a discretionary early release under 18 U.S.C. § 3621."  See Instant Matter, Docket Entry No. 13-13, at 15 (emphasis supplied).  This observation is not entirely correct. True, Petitioner does not have, under 18 U.S.C. § 3621, a liberty interest in a *vested* right to reduction of his sentence: the decision is statutorily reserved to be subject to the BOP's discretion.  See Magnin v. Beeler, 110 F. Supp. 2d 338, 340 n.2 (D.N.J. 2000).  However, statutory or regulatory enactments by state or federal authorities may create an entitlement protected by the Due Process Clause, i.e.,  an *expectation of eligibility* is entitled to some measure of due process protections.  See, e.g., Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7 (1979) (addressing the right to parole consideration); see also Board of Pardons v. Allen, 482 U.S. 369 (1987); Prevard v. Fauver, 47 F. Supp.2d 539, 545 (D.N.J.), aff'd, 202 F.3d 254 (3d Cir. 1999).  This form of entitlement is not limited solely to the question of parole hearings; for instance, under the Second Chance Act or under the holding of Barden v. Keohane, 921 F.2d 476 (3d Cir. 1991), the BOP owes its prisoners good faith consideration of the period during which the prisoner should be placed in a half-way house or of the period that might be credited against the prisoner's federal sentence on the basis of the prisoner's already served state sentence: each such discretionary determination by the BOP arises from the prisoner's due process right to have the BOP conduct a bona fide review of the

15.     As noted supra, the latest round of Petitioner's assertions (that gave rise to the instant matter) was based on his claim that, during the twelve months preceding his actual entry in the BOP's custody, Petitioner was abusing controlled substance(s) and, upon his submission of a request for RDAP-based incentive, duly presented the BOP with a proper evidentiary proof of such drug abuse.  Addressing *these particular points*, Respondent's answer and the attached record presented the Court with an entirely different picture.  Specifically, Respondent's answer stated as follows:

> Petitioner [whose history shows multiple convictions for numerous frauds, false claims, false statements, larceny, and forged securities offenses,] is serving a 65 month aggregate custodial term imposed on April 29, 2008, by the [EDNY, and his] current projected release date is June 5, 2011. . . . [Petitioner] has been in continuous federal custody since March 16, 1999. [Petitioner] sought to have the sentencing court order the BOP to enroll him in the RDAP.  The sentencing court denied the request [and] clearly advised [Petitioner] that admission to the RDAP is a matter left to the decision of the BOP . . . .
>
> . . .
>
> [T]he BOP [makes] available appropriate substance abuse treatment for . . . all "eligible" prisoners. An eligible prisoner is one[: (a) who is "determined by the [BOP] to have a substance abuse problem," [and (b)]who is willing to participate in a residential substance abuse treatment program.  As an incentive for prisoners to participate in such a substance abuse treatment program, Congress . . . provided that a prisoner convicted of a nonviolent offense who has successfully completed a treatment program, may have the custodial period he otherwise must serve reduced by the BOP by not more than one year.  . . .  In implementing the RDAP, the BOP has determined that[,] for an inmate to be admitted to the program, he must have "a verifiable substance use disorder."  28 C.F.R. § 550.53(b) (1); see also, 28 C.F.R. § 550.53(e).  To assure that this qualification is met, the inmate must be screened by a Drug Treatment Specialist ("DTS") [who] review[s] the

---

multiple pertinent factors.  Here, same as in a parole scenario, or in a Barden or in a Second Chance Act scenario, Petitioner has due process right to a bona fide review.  However, since – as the remainder of this Opinion details – the record is heavily laden with evidence that the BOP did indeed conduct a bona fide review of Petitioner's application, Petitioner's rights to a good faith consideration of his application were not violated.

inmate's BOP central file and other collateral sources of documentation to determine whether . . . there is documentation available to verify the inmate's use of a specific drug, and verification establishing a pattern of substance abuse or dependence. [See] P.S. 5330.11, § 2.5.8, p. 11 . . . Recreational, social or occasional use of drugs that does not rise to the level of excessive or abusive use, will not provide the necessary verification. . . . In the event there is no verifying information in the inmate's PSR or in his central file, the inmate will be informed that he may . . . seek documentation from a substance abuse treatment provider where he previously received treatment. Such documentation must have been written at the time treatment was provided and must demonstrate that a substance use diagnosis was completed at the time the inmate was seen, and that treatment was provided for that documented substance abuse diagnosis. Such documentation may not state that the substance abuse treatment provider "thought" the inmate had a drug problem when he was seen for the problem. Further, the documentation must be sent to and received by the drug abuse treatment staff at the [confinement] institution. It must not be sent to the inmate and then provided by the inmate to the drug abuse treatment staff. The inmate may also seek verifying documentation from a probation or parole officer, or from a social services professional, that [documentation, too] is to be sent to and received by the drug abuse treatment staff at the institution. He may also offer physical proof of an addiction, such as track marks or abscesses. In the absence of acceptable verifying documentation, the inmate will not be interviewed by the Drug Abuse Program Coordinator for RDAP placement consideration.

. . .

On August 8, 2008, DTS Craig Young conducted an RDAP eligibility interview of [Petitioner]. It was determined that [Petitioner's] date of arrest on his current conviction was March 16, 1999, and that the relevant 12 month period [was], therefore, March 16, 1998 to March 16, 1999. [Petitioner] self-reported periodic problems with alcohol and daily use of heroin during [this] 12 month period. [In light of] the information [asserted by Petitioner] during the interview, the Drug Abuse Program Coordinator, Brian Redondo, concluded that [Petitioner might have been  honest about his] substance abuse or dependence, but [Mr. Redondo also noted] that the BOP's central file on [Petitioner did] not support this [conclusion].  In particular, [Petitioner's] PSR [did] not support a history of substance abuse or dependence and [Petitioner's] claims in this regard could not be substantiated [through other means. Specifically, Petitioner's] BOP central file contain[ed] copies of the PSR prepared in [Petitioner's] most recent federal criminal cases. . . . The first of these, dated October 19, 1999, state[d] that [Petitioner self-]reported using heroin [since] 1995 and . . . until the date of his bail revocation [but] there has never been any documented indication of opiate use by [Petitioner] in his then 27 year history with the federal probation

system, and that the results of routine urinalysis testing during supervised release were negative for the presence of opiates.  The PSR also noted that in a civil deposition taken of him on December 21, 1998, [Petitioner] denied ever having used heroin. [Moreover,] during Scott's initial interview with Pretrial Services on December 1, 1997, he denied any current drug use but reported prior use of marijuana and experimentation with cocaine, heroin and pills [prior to 1997].  The PSR [in addition] noted that [Petitioner] was . . . claiming that he . . . had received treatment [for heroin addiction, in 1995 and 1997] at River Street De-Tox in Hyde Park, MA, at St. Elizabeth's Hospital in Brighton, MA, and at Windsor Hospital in Windsor, Ontario. [However,] River Street De-Tox and St. Elizabeth's Hospital had no record of treatment for [Petitioner], and Windsor Hospital could not be located [and, thus, presumed to be a fictitious entity]. The second PSR, dated August 13, 2007, noted that [Petitioner's] statements with regard to a history of illicit drug use have been a point of contention in prior presentence investigations, . . . referenced some of the above statements from the first PSR [and] indicate[d] that [while Petitioner's] bail . . . was revoked on April 26, 1999, [he] has been in federal custody since March 16, 1999. [In addition, this second] PSR also noted [Petitioner's] new assertions that he had two separate inpatient admissions to Hotel-Dieu Grace Hospital in Windor, Ontario, for treatment of his heroin addiction, and that he participated in a SOP residential drug treatment program in 1982 and 1984.  [However,] the Canadian hospital had no record of treatment for [Petitioner], and the SOP's SENTRY database records for [Petitioner] did not support the assertion of participation in a residential drug treatment program in 1982 and 1984.  Finally, [Petitioner] claimed that on prior arrests in 1993 and 1995, he was charged with possession of an unidentified controlled substance and possession of hypodermic needles.  He also produced documentation showing that he had been in possession of a needle exchange card when he was arrested in December 1995 and on March 16, 1999.

. . .

[Respondent also takes notice of the fact that Petitioner] has submitted to this Court a copy of a discharge summary from the Nassau Health Care Corporation in East Meadow, New York.  The document pertains to an admission to that facility for the two day period of January 16-17, 2007.  The document references the fact that [Petitioner] is a prisoner [and] refers to a final diagnosis of anemia. Secondary diagnoses, to the extent they are legible, identify Hepatitis C and Hypothyroidism. [However,] the document does not indicate that [Petitioner] was treated at that facility for or diagnosed with a heroin addiction or dependence. Nor does it appear that the second page of the document even pertains to him. That page contains no identifying information, appears to contain handwriting different from that on the first page, and states that the person from whom the recorded information was

taken was born in "CT" (Connecticut), [while Petitioner] was born in Birmingham, Alabama. Finally, nothing in that document verifies or even indicates that [Petitioner] had a heroin addiction or dependence during the relevant 12 month period of March 16, 1998 - March 16, l999.

Docket Entry No. 13-13, at 2-10 (selected citations omitted, footnotes omitted).

16.    The record attached by Respondent verified the correctness of Respondent's factual position. The declaration of Mr. Redondo scrupulously traced the investigation conducted by the BOP and the evidentiary matter examined, and largely corresponded to Respondent's recap of the same. See Docket Entry No. 13-1. Petitioner's presentence reports (prepared for the purposes of Petitioner's DMASS and EDNY criminal prosecutions) detailed Petitioner's extensive "in-and-out-and-in-prison-again" history dating back to 1972, as well as his history of parole and probation violations, but – in no ambiguous terms – clarified that there had been no documented verification of Petitioner's use of opiates, see Docket Entry No. 13-8 (noting lack of verifiable documentation as to substance abuse), and Docket Entry No. 13-9 (noting, inter alia, that – even though Petitioner was occasionally diagnosed and treated for multiple mental abnormalities – there was no record of Petitioner's treatment for drug abuse).

17.    In response, Petitioner did not dispute the fact that he entered the controlled environment of the BOP's custody on March 16, 1999, and – thus – the twelve-month period preceding that date was correctly calculated by Respondent as spanning from March 16, 1998 to March 15, 1999. See Docket Entry No. 16 (Petitioner's traverse); see also Docket Entry. No. 29 (Petitioner's latest letter to the Court); accord Docket Entry No. 21 (Petitioner's motion for "summary judgment"). Rather, Petitioner once again changed his claims, i.e., the assertions

stated in his traverse and the documents he filed thereafter could be roughly subdivided into two groups: (a) claims that Petitioner had "some" evidence "related" to Petitioner's handling controlled substance at "some" periods of time, and those submissions should have been "enough" for the BOP; and, in light of the foregoing, (b)  claims that Respondent (and the Court) should not focus on the twelve months preceding Petitioner's entry in the BOP's custody, and that the Court should re-focus its attention on the events that took place in 1993, or 1994, or 1995 or 1997 (that is, the times with regard to which Petitioner has an evidentiary proof of his handling of controlled substances).  The Court addresses these two lines of claims seriatim.

18.     With regard to the first group of arguments, Petitioner's assertion employs a "trick-of-hand" approach in the sense that Petitioner's motion for reconsideration (re-qualified by this Court into the petition that gave rise to this matter) asserted Petitioner's presentment of drug abuse evidence with regard to the March 1998 - March 1999 period, but – being faced with the facts presented by Respondent – Petitioner elected to switch his discussion to the events that took place in 1993, 1994, 1995 and 1997.  See generally, id. (asserting, e.g., that he was arrested on the charges of possession of heroin in 1993, or arrested on the basis of possession of a hypodermic needle in 1995, or having a small quantity of marijuana seized in his bedroom in 1997, or being the holder of a needle exchange card in 1997; these allegations are supplanted by Petitioner's conjecture, e.g., that he must have contracted Hepatitis C as a result of his alleged drug use).[6]  In sum, the Court's examination of Petitioner's multiple

---

[6]  Even if Petitioner's evidence was relevant to the Court's review, Petitioner's submissions do not establish that Petitioner was *abusing* controlled substances.

filings leads this Court to agree with Respondent's observation that Petitioner "has never established in the manner required that he had a heroin addiction or dependence during the relevant period of March 16, 1998 - March 16, 1999."  Docket Entry No. 20, at 2.  Indeed, if there is a unifying feature to Petitioner's lengthy submissions, it is the stark absence of any reference to any verifiable <u>evidentiary</u> proof that Petitioner was abusing or having a dependency to controlled substances during the period from March 16, 1998, to March 19, 1999.  Therefore, Petitioner's challenges that the Court discerned in Petitioner's third motion for reconsideration (<u>i.e.</u>, the document which the Court construed as the petition that gave rise to this matter) will be dismissed, as factually unsupported.  In contrast, the Court finds that, so long as the focus is on the period from March 16, 1998, to March 15, 1999, the BOP did not abuse its discretion when it concluded that Petitioner, due to his inability to provide any verifiable proof of addiction, was not a prisoner eligible for the RDAP-based reduction of sentence.[7]

19.     In his traverse, his "motion for summary judgment," and in his latest letter expressing Petitioner's disagreement with Respondent's reliance on a recent Ninth Circuit decision, Petitioner changed  the legal focus of his claims, by trying to align his new, mutated claims to the evidentiary proof provided by Respondent.  <u>See</u> Docket Entries Nos. 16, 19, 21 and 29.  Petitioner's new claims could be roughly reduced to the following: (a) "any" document that Petitioner can point to that might be construed, as evidence of Petitioner's occasional consumption of controlled substances should be deemed a sufficient proof of his drug abuse

---

[7] Petitioner was expressly offered to partake in a drug rehabilitation treatment program that did not entail reduction of his sentence, but he declined to take advantage of that opportunity.

for the purposes of the RDAP; (b) the focus on the March 16, 1998 - March 16, 1999 period is erroneous, since Petitioner believes that the correct focus should be on "a" period that preceded, at some point (no matter how far in the past), one of Petitioner's many arrests; (c) in any event, focus on the twelve-month period should be inapplicable to Petitioner because, at the time when Petitioner was committing the multitude of his crimes, the BOP did not expressly articulate its adoption of the twelve-month rule; and (d) because Petitioner wished to assert Equal Protection Clause challenges, but these challenges were left unaddressed by Respondent, Respondent's focus on Petitioner's procedural shortcomings entitles Petitioner to a hearing and to habeas relief.  See id.

20.     In light of the prior history of the instant matter, and in light of the history of Petitioner's action that gave rise to this matter (that is, Civil Action No. 09-0929), Petitioner's litigation tactics prompt against usage of the best practices: indeed, the Court has concerns that, upon the Court's order directing Respondent to re-answer Petitioner's new claims, Petitioner will submit, again, a traverse and volumes of motions changing his claims all over again.[8]  In light of these concerns, and in light of facial lack of merit of Petitioner's re-mutated claims articulated in his traverse and the latest rounds of letters and motions, the Court finds it appropriate to spare Respondent the burden of addressing Petitioner's new assertions and will dismiss these meritless claims sua sponte.[9]

---

[8]  In that respect, the Court is mindful of the First Circuit's guidance that this Petitioner's practices "bring[] to mind the adage that no good deed goes unpunished."  United States v. Scott, 270 F.3d 30, 34 and n.1 (1st Cir. 2001).

[9]  The Habeas Rules require the assigned judge to review a habeas petition and to sua sponte dismiss the petition without ordering a responsive pleading "[i]f it plainly appears from the  petition and any attached exhibits that the petitioner is not entitled to relief in the district

21.   The first new claim now raised by Petitioner is that RDAP enrollment and the RDAP-based sentence reduction should be granted upon "any" written evidence in the prisoner's file, i.e., that the very existence of a single written document, no matter how unreliable or how vaguely relevant to the goals of the RDAP, should be deemed a sufficient basis for grant of the RDAP-based incentive.  See, e.g., Instant Matter, Docket Entry No. 16, at 7-8 (asserting that, if Mr. Redondo saw "any" writing in Petitioner's prison file vaguely hinting that Petitioner might have used, at some point, controlled substances, Mr. Redondo "was bound to accept it, notwithstanding anything else that may be said" and, in building on the aforesaid contention, maintaining that Mr. Redondo was "bound" to accept, as sufficient proofs of Petitioner's drug abuse, the fact of Petitioner's arrest on the grounds of possession of heroin in 1993, Petitioner's 1995 arrest on the grounds of possession of a needle, the fact that small amounts of marijuana were seized from Petitioner during the 1997 search, Petitioner's possession of a needle and a needle exchange card on March 16, 1997, a 2007 statements that Petitioner asserted using heroin ten years ago, the fact that Petitioner was infected with Hepatitis C and even an undocumented Petitioner's assertion that, in 2000 and while being already incarcerated on the string of his current sentences, he was using heroin and marijuana that he, allegedly, illegally obtained in prison).  In support of his contention, Petitioner quotes a sentence from P.S. 5330.10 reading that "[a]ny written documentation in the inmate's central file which indicates that the inmate used the same substance, for which a diagnosis of abuse or dependence was made via an interview, shall be accepted as

---

court."  See 28 U.S.C. § 2254, Rule 4, applicable to § 2241 proceedings through Rule 1(b).

verification of a drug abuse problem."[10]  See id.  Petitioner misconstrues the usage of the word "any" in the sentence he quotes, as well as the entirety of the meaning of that sentence, since:

(a)     the sentence is expressly entered, as a qualifier, to the preceding sentence reading "[in addition to the impressions obtained by DTS as result of the inmate's interview,] there must be *verification* in the [inmate's] Presentence Investigation report or other similar documents in the central file which support the diagnosis."  Id. (emphasis supplied). Here Petitioner's presentence reports and all similar documents – with striking unanimity – indicate lack of *verifiable* proof as to Petitioner's drug abuse; and

(b)     the written documents referred to in the sentence quoted by Petitioner must, in addition to being properly verifiable, address the issue of Petitioner's "*use*" of a particular substance, rather than to his "possession" of controlled substances, or his possession of a needle, or his possession of a needle exchange card.  Accord this Opinion, n. 6.  Here, the documentation referred to by Petitioner is silent as to any "use" of controlled substance.  See id.

Therefore, Petitioner's assertion (that any shred of written document in his central file which could be construed as vaguely hinting at a connection between Petitioner and controlled substances, should be considered binding on the BOP in regard to the agency's RDAP-

---

[10]  The BOP has repealed Program Statement 5330.10, and issued new policy statements governing psychology treatment programs and RDAP early release benefit procedures.  These new policy statements took effect on March 16, 2009.

related analyses) is without merit.  Indeed, it would be anomalous to expect Petitioner's reading of P.S. 5330.10 be adopted by the BOP: such regime would effectively create an incentive for all federal defendants to generate volumes of written statements (the content of which would be vague enough to spare these defendants any penal consequences) loosely hinting at their potential connection with controlled substances in hope that these statements would find their way into these inmates' central files and later on reward them for their "ingenuity" with one-year sentence reductions.  Since the BOP's construction of its P.S. 5330.10 (as requiring verifiable proof in the nature of a presentence report or a comparably reliable document establishing the inmate's actual and systemic use of the controlled substance identified during the inmate's interview) is not an impermissible construction of the enabling statutory mandate, the Court will not disturb the BOP's reading of the P.S. 5330.10.  See Chevron, 467 U.S. 837.

22.     Petitioner's next re-mutated contention is reflected in the following sentiments: (a) "[the applicability of] the 12 month period being based on he date of arrest(s) rather than the 12 months prior to incarceration can no longer be disputed," Docket Entry No. 16, at 3; (b) "the issue here . . . is whether the relevant period is the 12 months prior to incarceration as claimed by . . . Redondo or the 12 months prior to an inmate's arrest," Docket Entry No. 29, at 1; (c) "Weiman memorandum [referring to the 12-month period] is due no . . . Chevron deference," Docket Entry No. 16, at 4; and (d) "[Petitioner asserts that his] relevant arrest dates should be 12/5/95 and 12/1/97 rather that the 3/16/99 date [when he entered the BOP's custody upon revocation of his bail, and] the 12 month period should be 12/1/94 to 12/5/95, 12/5/95 to 12/1/97 excluding the periods of time in custody that are intervening as he was

in federal custody for the bulk of that period." Id. at 3. As part of this re-mutated claim, Petitioner asserts that the recent decision by the Ninth Circuit cited by Respondent is inapplicable to the case at bar. See Docket Entry No. 29.

23.    The decision which Petitioner advocates is Mora-Meraz v. Thomas, 601 F.3d 933 (9th Cir. 2010). Unlike Petitioner, this Court finds the Ninth Circuit's determination in Mora both relevant and warranting a detailed discussion. In Mora, the petitioner sought admission to the RDAP, but was denied admittance (and the RDAP-based sentence reduction) on the grounds that neither his presentence report nor the remainder of his central file contained documentation of his drug abuse during the 12 months preceding his incarceration. The petitioner claimed that the BOP's requirement of documentary proof of substance abuse during 12 months preceding imprisonment was invalid. The Ninth Circuit concluded, inter alia, that the requirement was not an abuse of discretion, explaining as follows:

> The Bureau promulgated a regulation further defining eligibility for the RDAP. This regulation read, in relevant part:
>
>     (a)    Eligibility. An inmate must meet all of the following criteria to be eligible for the residential drug abuse treatment program.
>
>         (1)    The inmate must have a verifiable documented drug abuse problem.
>
> 28 C.F.R. § 550.56. Neither the statute nor the regulation defines "verifiable documented drug abuse problem." The Bureau has issued a program statement explaining how it determines whether an inmate has a "verifiable documented drug abuse problem." Under Program Statement 5330.10, . . . eligibility is based on multiple components. [Among other requirements, there is a requirement that] "[t]he inmate must meet the diagnostic criteria for substance abuse or dependence indicated in the Diagnostic and Statistical Manual of the Mental Disorders, Fourth Edition, (DSM -- IV)." Id. . . .
>
> Since the Bureau bases its substance abuse or dependence diagnosis on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (2000) ("DSM-IV"), it is important to understand how the DSM-IV classifies substance abuse and

dependence.  The DSM-IV defines dependence generally as "a cluster of cognitive, behavioral, and psychological symptoms indicating that the individual continues use of the substance despite significant substance-related problems."  DSM-IV, at 192.  Specifically, the DSM-IV defines dependence as "three or more of the [following] symptoms . . . occurring at any time in the same 12-month period": tolerance; withdrawal; increased amount of a substance or elevated duration of ingestion; unsuccessful attempts to cease use; escalated time expenditure securing, using, and recovering from the substance; reduction in outside activities; or continued use despite awareness of the consequences.  Id. at 192-94.  It defines substance abuse similarly to substance dependence, but substance abuse "do[es] not include tolerance, withdrawal, or a pattern of compulsive use and instead include[s] only the harmful consequences of repeated use."  Id. at 198.

Once dependence or substance abuse has been established, an individual can enter one of the stages of remission if none of the symptoms listed above are present for one month.  Id. at 195.  The DSM-IV uses "specifiers" to qualify the quality and degree of remission.  The quality of remission is categorized as either "Early" or "Sustained," and the degree is either "Partial" or "Full."

> Because the first 12 months following Dependence is a time of particularly high risk for relapse, this period is designated Early Remission.  After 12 months of Early Remission have passed without relapse to Dependence, the person enters into Sustained Remission.  For both Early Remission and Sustained Remission, a further designation of Full is given if no criteria for Dependence or Abuse have been met during the period of remission; a designation of Partial is given if at least one of the criteria for Dependence or Abuse has been met, intermittently or continuously, during the period of remission.

Id. at 192.

However, these remission specifiers are not applicable if a person is either on a prescribed agonist medication, such as methadone, or in a controlled environment "where access to alcohol and controlled substances is restricted," such as "closely supervised and substance-free jails."  Id. at 197.

. . . [T]he Bureau has also adopted an unwritten policy which mandates that the prisoner's file confirm that the inmate used the same substance within twelve months prior to incarceration.  While the central file, including the PSR, might show use of the same substance at some point during an inmate's past, the Bureau requires, that to be eligible for the RDAP, the inmate must show substance dependence or abuse within his last twelve months "on the street."

. . .

Page 28 of  40

[T]he APA also directs that [the courts] must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, our review of the [Bureau's] regulation is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" Crickon, 579 F.3d at 982 (quoting N.W. Ecosystem Alliance v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007)).

In Arrington, we explained that "[a] reasonable basis exists where the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" 516 F.3d at 1112 (quoting Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric., 415 F.3d 1078, 1093 (9th Cir. 2005) (internal citation omitted)). We are not permitted to "supply a reasoned basis for the agency's action that the agency itself has not given." Crickon, 579 F.3d at 982. We also may not read into the agency's silence and make inferences thereupon. Id. "However, even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." Id. (internal quotation marks omitted). Our job is to rely upon "the administrative record to determine whether the agency has articulated a rational basis for its decision." Arrington, 516 F.3d at 1112. . . . [Here], we hold that the Bureau did, in fact, set forth an adequate explanation for the twelve-month limitation on RDAP eligibility. . . . [W]e conclude that the requisite "rational connection" was made by the agency when it incorporated the provisions of the DSM-IV as its benchmark for determining whether an inmate suffers from diagnosable substance abuse or dependence. Program Statement 5330.10, Chapter 5.4.1(a)(1).

. . . First, with regard to the documentation requirement, the regulation read: "The inmate must have a verifiable *documented* drug abuse problem." 28 C.F.R. § 550.56(a)(1) (emphasis added). Therefore, it is no surprise that the Bureau directs the inmate to provide evidence corroborating his alleged drug abuse or dependence problem either within the PSR or the remainder of his central file. Second, the Bureau's reason for selecting a twelve-month window – and more specifically the twelve months prior to incarceration – is apparent from the DSM-IV. The DSM-IV explains that the "cessation of Dependence" occurs when the individual enters "Remission." DSM-IV, at 195. A person is said to be in remission if "none of the criteria for Substance Dependence or Substance Abuse have been present for at least 1 month." Id. However, "the first twelve months following Dependence is a time of particularly high risk for relapse," and a person is not said to be in "Sustained Full Remission" until the end of that twelve-month phase. Id. at 195-96. Once an individual passes the twelve-month mark, he is in Full Remission, defined by the DSM-IV as occurring when "[t]here are no longer any

symptoms or signs of the disorder, but it is still clinically relevant to note the disorder." Id. at 2.  While this is not the same as "recovered," an individual in Full Remission is not in need of medical intervention other than continued evaluation. Id.

Following the DSM-IV analysis, the Bureau's rationale for imposing the twelve-month rule is reasonable.  Without documented proof that an inmate has used an offending drug within twelve months prior to incarceration, it is reasonable to infer that the inmate is no longer dependant or an abuser. Id. at 195.  It follows that such an individual has no need for the highly intensive residential drug treatment program, RDAP.  If the individual believes he still has a need for treatment and assistance, he may enroll in a less comprehensive program offered in the prison.

Furthermore, following the DSM-IV, the remission specifiers do not apply once an individual is incarcerated.  This makes sense.  A person in a substance-free prison does not have access to his or her drug of abuse.  While incarcerated, the individual may not exhibit the symptoms of abuse or dependence – ingesting the drug, reducing outside activities, escalated time expended securing the drug, etc. – but there is no way to determine whether this cessation is truly an indication of remission or simply an externally imposed consequence.  Thus, the relevant time period the Bureau uses to assess whether an inmate is diagnosable as suffering from substance abuse or dependence is the twelve months prior to incarceration.

Here there exists a reasonable basis for the Bureau's decision to adhere to the DSM-IV's twelve-month rule and a reasonable basis for the Bureau to apply that rule to require documented use of a drug within the twelve months prior to incarceration.  Therefore, we conclude that the Bureau's implementation of the twelve-month rule was neither arbitrary nor capricious under § 706.

Mora-Meraz, 601 F.3d at 936-43.

In other words, the Ninth Circuit conducted an analogous evaluation of the DSM-IV,

discerned the same rationale for the BOP's adoption of the DSM-IV as its benchmark and

arrived at the analogous conclusions as the ones reached by this Court in its May Opinion,

although elaborating on the relation between the 12-month-prior-to-incarceration rule in far

more detail than this Court.

24.     In light of the additional clarifications provided in Mora, this Court now turns to Petitioner's

contentions that "[t]he 12 month period being based on the date of arrest(s) rather than the

12 months prior to incarceration can no longer be disputed," "Weiman memorandum is due no . . . <u>Chevron</u> deference," "[Petitioner's ] 12 month period should be 12/1/94 to 12/5/95, 12/5/95 to 12/1/97 excluding the periods of time in custody that are intervening as he was in federal custody for the bulk of that period," etc.  Each of these contentions is without merit.  The distinction Petitioner tries to mount, that is, the distinction between "12 months prior to arrest" and "12 months prior to incarceration" is a distinction without a substantive difference intended by the BOP's implementation of the guidelines set forth by DSM-IV:it is abundantly clear that the 12-month period examined by the BOP for the purposes of RDAP is the twelve months prior to the prisoner's *entry into a controlled environment*. Read in that context, the terms "arrest" and "incarceration" mean the same, <u>i.e.</u>, a physical seizure of the prisoner's by authorities who place the prisoner into a continuous controlled environment.  Hence, if the defendant is arrested and is not released back "on the street," the date of the arrest supplies the cut-off point ending the 12-month period reviewed for the purposes of the RDAP.  Conversely, if the defendant, upon arrest, is released – be it on bail or otherwise – into a non-controlled environment (as it was the case with Petitioner, who was released on bail into home confinement and could have been visited by any person furnishing him drugs during the entirety of that home confinement period), then the cut-off point ending the 12-month period reviewed for the purposes of the RDAP occurs when the defendant is taken into continuous custody, e.g., upon having his bail revoked, as it happened with Petitioner here.  Conversely, the dates of the defendant's prior arrests that were followed by releases and re-arrests, and re-releases, are wholly irrelevant to the BOP's review, since they have no bearing on the BOP's ability of determining whether the prisoner,

on his or her own, went into Sustained Full Remission prior to entry into the BOP's custody (and, hence, does not need an incentive to partake in the intensive and demanding RDAP program) or is still in danger of relapse and, hence, might benefit from participating in the RDAP program and might be in need of an incentive to undertake this participation.  In light of the foregoing, the BOP's selections of the 12-month period prior to placement in continuous controlled environment "makes sense," as the Ninth Circuit observed, and would not be second guessed by the Court.  Therefore, Petitioner's re-mutated claim alleging that the BOP abused the delegated mandate by focusing, for the purposes of its RDAP analysis, on the 12-month period preceding the prisoner's taking into controlled environment, will be dismissed as facially without merit.[11]

25.     Petitioner's next new claim is an assertion that the 12-month period was applied to him in error because, at the time Petitioner was committing his many crimes, the BOP did not expressly articulate its unwritten policy of focusing, for the purposes of its RDAP analysis, on the 12-month period preceding the prisoner's taking into a controlled environment.  See Docket Entry No. 16, at 9-11; Docket Entry No. 29, at 1.   The Court reads this new claim as asserting that the 12-month rule was applied to Petitioner in violation of the Ex Post Facto Clause.  If the Court's reading of this Petitioner claim is correct, that claim is also without merit.   Article I, Sections 9 and 10, of the United States Constitution, prohibit the federal

---

[11]  Petitioner also asserts that, in 2007 and 2008, while incarcerated, he used "both heroin and marijuana at the times he could acquire them or when marijuana was made available to him" Civil Action No. 09-0929, Docket Entry No. 8, at 16.  However, Petitioner's assertion to that effect is: (a) undocumented; and (b) wholly irrelevant, since – as the declaration of Mr. Rodondo clarifies – it would be entirely anomalous for the BOP to "reward" the inmates committing disciplinary violations through consumption of drugs with a sentence reduction, hence promoting this illegal behavior.  See Instant Matter, Docket Entry No. 13-1.

and state governments from passing any "ex post facto Law." In <u>Collins v. Youngblood</u>, 497 U.S. 37, 41 (1990), the Supreme Court clarified that the Clause is aimed at laws that "retroactively alter the definition of crimes or *increase the punishment* for criminal acts." <u>Id.</u> at 43 (citations omitted, emphasis supplied). The Supreme Court also noted that "[r]etroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept." <u>Garner v. Jones</u>, 529 U.S. 244, 250 (2000) (citations omitted). "Whether retroactive application of a particular change in . . . law respects the prohibition on <u>ex</u> <u>post</u> <u>facto</u> legislation is often a question of particular difficulty when the discretion vested in [the administrative body] is taken into account." <u>Id.</u> For instance, in 1995, the Supreme Court considered the constitutionality of a California parole amendment that had no effect on the standards for fixing a prisoner's initial date of eligibility for parole or for determining his suitability for parole, but permitted the Board of Prison Terms to decrease the frequency of parole suitability rehearings from annual hearings up to hearings every three years. <u>See</u> <u>California Dept. of Corrections v. Morales</u>, 514 U.S. 499 (1995). Rejecting the argument that the California amendment violated the <u>Ex</u> <u>Post</u> <u>Facto</u> Clause, the Supreme Court emphasized that "the question of what . . . adjustments 'will be held to be of sufficient moment to transgress the constitutional prohibition' must be a matter of 'degree.' In evaluating the constitutionality of [the change in the particular law], we must determine whether it produces a sufficient risk of *increasing the measure of punishment attached to the covered crimes*." <u>Id.</u> at 509 (citations omitted, original emphasis removed, alternative emphasis supplied). However, neither the presence nor the exercise of discretion displace the protections of the Ex Post Facto Clause: indeed, the very nature of discretion implies

both the capacity, and the obligation, to change and adapt based on experience.  See Garner,
529 U.S. at 253.  "The [adoption of a new] policy enables the [administrative body] to put
its resources to better use, to ensure that those prisoners who should receive [certain
benefits] come to its attention."  Id.  In light of the foregoing, the BOP's adoption and
application of the 12-month rule could not violate the Ex Post Facto Clause: the rule
presented, at most, a procedural modification but by no means altered the substantive criteria
or increased the punishment imposed in connection with the crimes.  Simply put, the rule
allowed the BOP to focus on the more pertinent evidence relevant to the BOP's analyses of
RDAP applications.  Such chance does not qualify as an ex post facto violation.  Cf. Brooker
v. Warden, 1999 U.S. Dist. LEXIS 22361 (D.N.H. 1999) (addition of sexual offender
programs to the considerations used for parole does not violate the Ex Post Facto Clause).
Therefore, Petitioner's ex post facto challenges, if such were intended, are facially without
merit and will be dismissed.

26.     Finally, the Court turns to Petitioner's allegations that his Equal Protection rights were
        violated.[12]  Specifically, Petitioner asserts as follows: "Petitioner has direct personal

---

[12]  Respondent did not address the merits of Petitioner's equal protection claim in light of
Petitioner's failure to exhaust this claim administratively.  See Instant matter, Docket Entry No.
13-13, at 15, n. 11.  Respondent seems to be under an erroneous impression that, in light of this
shortcoming, Petitioner cannot seek to raise this claim in the instant proceeding.  However,
exhaustion is not a jurisdictional requirement and may be excused, for a number of reasons, see,
e.g., Richardson v. Grondolsky, 2009 U.S. Dist. LEXIS 89898, at *6-8 (D.N.J. Sept. 28, 2009)
(the Court's decision cited by Respondent, where the Court expressly provided examples of the
scenarios when the exhaustion requirement is not enforced).  In addition to the scenarios
exemplified in Richardson (e.g., where exhaustion is excused because it appears futile to direct
the litigant to seek administrative remedy or that requiring exhaustion would subject the litigant
to "irreparable injury"), unexhausted habeas allegations may also be dismissed on merits if, as
here, it plainly appears that the allegations state challenges that cannot entitle the litigant to
relief.  See 28 U.S.C. § 2254, Rule 4 (applicable to § 2241 proceedings through Rule 1(b)).

knowledge derived from his friendship with other inmates that there are numerous other inmates who have been accepted into and are current or past participants in the RDAP program at FCI Fairton who each have an equal to or lesser degree of substance abuse documentation that was verified." Civil Action No. 09-0929, Docket Entry No. 8, at 17; accord Instant Action, Docket Entry No. 16, at 4-5 ("Petitioner has direct personal knowledge that former inmate William Marcano #21902-038 was transferred to FCI Fairton's RDAP program on the basis of his multiple positive urinalysis tests [conducted] at FCI Schuykill"). Petitioner misreads the Equal Protection Clause. The Clause guarantees that "all persons similarly circumstanced shall be treated alike." Plyler v. Doe, 457 U.S. 202, 216 (1982); see also Vacco v. Quill, 521 U.S. 793, 799 (1997) ("The Equal Protection Clause commands that no State shall deny to any person within its jurisdiction the equal protection of the laws"). The Clause does not, however, require "things which are different in fact or opinion to be treated in law as though they were the same." Plyler, 457 U.S. at 216 (quoting Tigner v. Texas, 310 U.S. 141, 147 (1940), emphasis supplied). In other words, the Clause "is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.'" Artway v. Attorney General of New Jersey, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985)). To establish an equal protection violation, Petitioner must "allege and prove that [he] received different treatment from other similarly situated individuals or groups." Johnson v. Horn, 150 F.3d 276, 284 (3d Cir. 1998) (citation omitted). Moreover, "if a law neither burdens a fundamental right nor targets a suspect class, [the Court] will uphold the legislative classification so long as it bears a rational relation to some legitimate

end." Romer v. Evans, 517 U.S. 620, 631 (1996).  Petitioner's cannot validly assert that the RDAP-related provisions burden a fundamental right, see this Opinion, note 5, and it is well established that prisoners are not a suspect class, as "the status of incarceration is neither an immutable characteristic, nor an invidious basis of classification." Moss, 886 F.2d at 690 (internal citations omitted). Moreover, Petitioner does not even assert that he was discriminated on the grounds of being a member of a non-suspect class: all he asserts is that the prison officials evaluated his central file and, assessing the evidence therein, arrived at an *opinion* different from those they formed upon evaluating the files of other inmates.  In other words, what Petitioner asserts is not that he is "similarly situated" to the inmates who were admitted to the Fairton RDAP but that *he believes* that there should be a similarity drawn between the content of his central file and the content of the files of other inmates, i.e., Petitioner does not challenge the disparate treatment but challenges the difference in conclusions reached by the BOP officials upon examination of different documentation. Thus, Petitioner's claim places him, at most, in the "class" of prisoners who were found, upon evaluation of their files, ineligible for the RDAP-based incentive (since Petitioner is "similarly situated" only to those inmates), but no statement made in Petitioner's voluminous submissions indicates that these other deemed-ineligible-for-the-incentive prisoners were treated differently from Petitioner, i.e., that they were found ineligible but, nonetheless, granted the RDAP-based incentive in spite of that finding of ineligibility. Consequently, Petitioner's Equal Protection claim will be dismissed as facially meritless.

27.     In conclusion, having addressed three modifications of Petitioner's challenges, and finding that the panoply of Petitioner's initial, mutated and re-mutated habeas claims does not

warrant relief, the Court notes its grave concern with Petitioner's litigation tactics and takes this opportunity to inform Petitioner about the nature of the procedural devices and jurisdictional bases he uses and other aspects of legal process.

a.      With regard to his initial action, Civil Action No. 09-0929, Petitioner filed a multitude of motions for reconsideration, varying in style and form, stating alternative legal claims and changing Petitioner's facts. See Civil Action No. 09-0929, Docket Entries Nos. 3, 5, 11, 12, 16 and 20. Petitioner's practice (of filing a "motion for reconsideration" having new facts and/or new claims every time he obtained a judicial decision based on the facts or legal claims Petitioner asserted to his loss) is of concern. There are four basic grounds upon which a motion for reconsideration may be granted: (a) to correct *manifest errors of law or fact* upon which the judgment was based; (b) to present *newly-discovered or previously unavailable evidence*; (c) to prevent *manifest injustice*; and (d) an *intervening change* in prevailing law. See 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2d ed. 1995); see also Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986) (purpose of motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence). Conversely, this procedural device is not meant to be used to reargue already decided claims, or to raise different challenges, be they factual or legal.[13] "To support reargument, a moving party must show that

---

[13]  New matters must be pled, they cannot be raised in a motion for reconsideration or in traverse.  See, e.g., Bell v. City of Phila., 275 Fed. App'x 157, 160 (3d Cir. 2008); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004); Veggian v. Camden Bd. of

*dispositive* factual matters or *controlling decisions* of law were *overlooked by the court* in reaching its prior decision." <u>Assisted Living Associates of Moorestown, L.L.C., v. Moorestown Tp</u>, 996 F. Supp. 409, 442 (D.N.J. 1998) (emphasis supplied). Mere disagreement with the district court's decision is inappropriate on a motion for reconsideration: *it should be raised through the appellate process.* <u>See</u> <u>id.</u> (citing <u>Bermingham v. Sony Corp. of America, Inc.</u>, 820 F. Supp. 834, 859 n.8 (D.N.J. 1992), <u>aff'd</u>, 37 F.3d 1485 (3d Cir. 1994); <u>G-69 v. Degnan</u>, 748 F. Supp. 274, 275 (D.N.J. 1990)). Here, the Court expressly notifies Petitioner that dismissal of his habeas claims is final and with prejudice, and the Court withdraws its jurisdiction from both Petitioner's actions hence ripening them for appeal. Therefore, Petitioner's submission of another motion for reconsideration in this matter will be deemed abuse of legal process unless Petitioner's submission *clearly* falls – rather than self-servingly characterized by Petitioner as falling – within the four bases detailed to Petitioner at the beginning of this sub-paragraph.[14]

---

Educ., 600 F. Supp. 2d 615, 628 (D.N.J. 2009). <u>P. Schoenfeld Asset Management LLC v. Cendant Corp.</u>, 161 F. Supp. 2d 349, 353 (D.N.J. 2001); <u>Khair v. Campbell Soup Co.</u>, 893 F. Supp. 316, 337 (D.N.J. 1995); <u>Slay Transportation Co., Inc. v. United States</u>, 353 F.Supp. 555, 558 (E.D. Mo.1973).

[14]  In addition, in light of Petitioner's filing of three rounds of habeas petition, each changing the facts and/or legal focus of Petitioner's claims, this Court, being concerned about the consequences of Petitioner's litigation strategy, takes this opportunity to warn Petitioner about the concept of "abuse of writ." The concept differs from that of "successive petition." A "successive petition" raises grounds identical to those raised and rejected on the merits on a prior petition. <u>See</u> <u>Sanders v. United States</u>, 373 U.S. 1 at 15-17 (1963). By contrast, "[t]he concept of 'abuse of the writ' is [a broader concept, and it is] founded on the equitable nature of habeas corpus. . . . Where a prisoner files a petition raising grounds that were available but not relied upon in a prior petition, or *engages in other conduct that disentitles him to the relief he seeks*, the federal court may dismiss the subsequent petition on the ground that the prisoner has abused the

b.      The preceding point invites also a brief discussion of the umbrella issue of recreational litigation.  A "recreational litigant" is the "one who engages in litigation as sport and files numerous complaints with little regard for substantive law or court rules." Jones v. Warden of the Stateville Correctional Ctr., 918 F. Supp. 1142, 1153 (N.D. Ill. 1995)  (noting that, "[w]hen confronted with [a] recreational plaintiff, courts, to protect themselves and other litigants, have enjoined the filing of further case without leave of court" and citing In re Winslow, 17 F.3d 314 (10th Cir. 1994); In re Burnley, 988 F.2d 1 (4th Cir. 1992); and Mayfield v. Collins, 918 F.2d 560 (5th Cir. 1990)).  Indeed, it is well within the broad scope of the All Writs Act, 28 U.S.C. § 1651(a), for a district court to issue an order restricting the filing of meritless cases by a litigant whose manifold complaints aim to subject defendants to unwarranted harassment or raise concern for maintaining order in the court's dockets.  See e.g., In Re Oliver, 682 F.2d 443, 445 (3d Cir. 1982)  (citing Lacks v. Fahmi, 623 F.2d 254 (2d Cir. 1980) (per curiam); Harrelson v. United States, 613 F.2d 114, 115 (5th Cir. 1980) (per curiam); and Clinton v. United States, 297 F.2d 899, 901 (9th Cir. 1961), cert. denied, 369 U.S. 856 (1962)).  Here, it appears, Petitioner developed an unfortunate impression that frequent filings of unsubstantiated documents (and/or

---

writ." Id. at 17-19 (emphasis supplied).  The Court of Appeals clarified the workings of the doctrine of abuse of writ as follows: "When a prisoner files multiple petitions [seeking] relief [in the form of a writ], the abuse of the writ doctrine as set forth in 28 U.S.C. § 2244(a)  may bar his claims: No circuit or district judge shall be required to entertain an application for [another writ] to inquire into the detention of a person . . . if it appears that the [same issue was resolved] by a judge or court of the United States on a prior application for a writ of habeas corpus . . . ." Furnari v. United States Parole Comm'n, 531 F.3d 241 (3d Cir. 2008) (relying on Sanders, 373 U.S. at 9).

overly-voluminous filings, and/or constant change of the facts or legal claims being litigated) might yield a favorable reward in some form. This Court, therefore, strongly encourages Petitioner to consider carefully each of his applications, whether filed with this District or with any other state or federal court, and to avoid meritless litigation which might earn Petitioner an abuse-of-writ bar or other sanctions, if appropriate.

28.    For the foregoing reasons, Petitioner's claims will be dismissed, and his Petition will be denied. Such denial will be with prejudice, and this Court will withdraw its jurisdiction over this matter, as well as over Civil Action No. 09-0929, hence ripening Petitioner's challenges for appeal, in the event Petitioner wishes to undertake it.[15]

An appropriate Order accompanies this Memorandum Opinion.

 s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated: September 8, 2010

---

[15] The Court stresses, one more time, that the dismissal entered here is made solely with regard to Petitioner's habeas claims against Fairton officials raised in this matter and in Civil Action No. 09-0929. Petitioner's civil rights claims against Fairton officials are dismissed without prejudice to raising them by means of duly executed and properly filed civil complaint, as detailed in this Court's prior rulings entered in the instant matter and in Civil Action No. 09-0929; while Petitioner's claims against Terre Haute officials (be these claims in the nature of civil rights challenges or habeas challenges) are dismissed without prejudice to raising those claim by means of appropriate application(a) filed with the court(s) of appropriate venue, as detailed in this Court's prior decisions.